NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

TRAVELERS PROPERTY CASUALTY COMPANY OF AMERICA,
*Plaintiff/Appellee*,

*v.*

RYAN BOLLSCHWEILER, et al., *Defendants/Appellants*.

No. 1 CA-CV 20-0338
FILED 5-11-2021

Appeal from the Superior Court in Maricopa County
No. CV2018-003576
The Honorable Teresa A. Sanders, Judge

**AFFIRMED**

COUNSEL

Snell & Wilmer L.L.P., Tucson
By Joseph A. Kroeger, Audrey E. Chastain
*Counsel for Plaintiff/Appellee*

Arnett & Arnett P.C., Chandler
By Wayne C. Arnett, Mark W. Arnett
*Counsel for Defendants/Appellants*

---

**MEMORANDUM DECISION**

Presiding Judge David B. Gass delivered the decision of the Court, in which Judge Michael J. Brown and Judge David D. Weinzweig joined.

---

**G A S S**, Judge:

¶1 Ryan and Heather Bollschweiler own Redstang Enterprises (collectively, Redstang), an unincorporated business that builds horse-related corrals and structures. Redstang appeals the superior court's grant of summary judgment for Travelers Property Casualty Company of America. Because Redstang has shown no genuine issues of material fact, we affirm.

## FACTUAL AND PROCEDURAL HISTORY

¶2 Redstang did not qualify for workers' compensation insurance coverage in the marketplace because it had a lapse in insurance coverage. Redstang, therefore, applied for workers' compensation insurance through the National Council for Compensation Insurance (NCCI), the designated plan administrator for Arizona's "assigned risk plan." *See* A.R.S. § 23-1091.B. NCCI does not provide insurance coverage. Instead, it accepts applications, estimates the annual premium based on the application, and assigns the application to an insurer to provide coverage.

¶3 Employers apply for coverage through the assigned risk plan using standardized application forms. Employers provide basic information about their operations, using NCCI risk-rating codes to describe each task their employees perform. NCCI then multiplies each code's rate by the percentage of payroll spent on the task to determine an estimated premium. The application specifically notifies applicants that insurance coverage is "afforded under the applicable Workers Compensation Insurance Plan [WCIP] *developed or administered by NCCI*." (Emphasis added.) The application also included the following declaration:

> If determined eligible under the WCIP and as further consideration of policy issuance under the WCIP, by signing below, the undersigned Applicant also agrees:
>
> . . . .

2

> To take no action in any form to evade the application of an experience rating modification determined *in accordance with the applicable experience rating rules, as determined by NCCI.* (Emphasis added.)

In total, the application forms mention NCCI's plans, policies, and procedures more than two dozen times.

¶4        In its application, Redstang listed four employees and no uninsured subcontractors. Redstang used three NCCI codes to describe the tasks its employees perform: 5535, sheet metal work; 6400, fence installation and repair; and 5059, iron or steel erection of frame structures not over two stories in height. Based on this information, NCCI estimated Redstang's annual premium at about $6,850.00. NCCI then assigned the application to Travelers, who issued a workers' compensation policy to Redstang.

¶5        The policy expressly stated the initial premium was merely an estimate, and "[t]he final premium will be determined after this policy ends by using the actual, not the estimated, premium basis and the proper classifications and rates that lawfully apply to the business and work covered by this policy." To that end, the policy required Redstang to "keep records of information needed to compute premium."

¶6        Redstang entered into a financing agreement with Imperial PFS to pay the estimated premium. The agreement included a power of attorney, giving Imperial the authority to cancel the policy on Redstang's behalf if Redstang defaulted on its installment payments.

¶7        Several months later, Redstang defaulted on its payments to Imperial. Based on the default, Imperial exercised its authority under the power of attorney and mailed a letter to Redstang and Travelers cancelling Redstang's policy. Redstang did not object to the cancellation, and Travelers complied with Imperial's request to cancel the policy.

¶8        Under NCCI practices and consistent with the policy terms, Travelers conducted a cancellation audit. The audit revealed two notable issues: (1) along with the four listed employees, two subcontractors required coverage; and (2) Redstang's records did not contain adequate information to allow Travelers to segregate Redstang's employees' work by classification as required by NCCI Rule 2G.

¶9        Rule 2G, titled "Interchange of Labor," provides in relevant part:

3

Some employees may perform duties directly related to more than one properly assigned classification . . . . Their payroll may be divided among the properly assigned classifications provided that:

1. The classifications can be properly assigned to the employer according to the rules of the classification system, and

2. The employer maintains proper payroll records, which show the actual payroll by classification for that individual employee.

a. Records *must reflect actual time spent working within each job classification* and an average hourly wage comparable to the wage rates for such employees within the employer's industry.

b. Estimated or percentage allocation of payroll is not permitted.

Note: If payroll records do not show the actual payroll applicable to each classification, the entire payroll of the individual employee *must be assigned to the highest rated classification that represents any part of his or her work.*

(Emphasis added.)

¶10        As the result of a flood, Redstang failed to retain most of the time records the auditor reviewed. Redstang produced the few that survived—37—in this litigation. These surviving time sheets typically have a few words to explain each employee's workday—sometimes covering more than 12 hours. Though some explicitly say "roofing," most contain vague descriptions such as "welding," "sheet metal," or "red heads." Others have multiple duties lumped together for a day. One timesheet provides no work description at all listing only "47 y Greenway."

¶11        Because Travelers could not identify "the actual time spent working within each job classification," it calculated Redstang's final premium using only "the highest rated classification," code 5059, as Rule 2G requires. This resulted in an annual premium of $48,171.00. Redstang disputed the audit twice and Travelers modified the rating codes for one employee, revising Redstang's annual premium down to $47,453.00, which included a short-term cancellation penalty. Travelers then deducted the

$6,849.00 estimated premium Redstang paid, leaving a balance of $40,604.00 due on the policy.

¶12        When Redstang failed to pay the outstanding balance, Travelers sued for breach of contract. Redstang answered, asserting counterclaims of consumer fraud and deceptive insurance practices. Travelers then moved for summary judgment on its breach of contract claim and Redstang's counterclaims. After briefing and oral argument, the superior court found for Travelers, entering judgment against Redstang for: $40,604.00, with interest, in contract damages; $10,000.00 in attorney fees; and $6,405.03 in taxable costs. Redstang timely appealed. This court has jurisdiction under article VI, section 9, of the Arizona Constitution, and A.R.S. § 12-2101.A.1.

## ANALYSIS

I.    **The superior court correctly granted summary judgment on Travelers's breach of contract claim.**

¶13        Travelers's breach of the contract claim requires it to prove "the existence of the contract, its breach[,] and the resulting damages." *See Thomas v. Montelucia Villas, LLC*, 232 Ariz. 92, 96, ¶ 16 (2013) (quotation omitted). Redstang argues summary judgment was inappropriate because Travelers did not prove a breach or damages. We disagree.

¶14        Summary judgment is appropriate when "no genuine dispute as to any material fact" exists and "the moving party is entitled to judgment as a matter of law." Ariz. R. Civ. P. 56(a); *see also Orme Sch. v. Reeves*, 166 Ariz. 301, 305 (1990). This court reviews a superior court's grant of summary judgment *de novo*, viewing the facts in the light most favorable to the non-movant, and will affirm "for any reason supported by the record, even if not explicitly considered by the superior court." *See KB Home Tucson, Inc. v. Charter Oak Fire Ins. Co.*, 236 Ariz. 326, 329, ¶ 14 (App. 2014).

A.    **The NCCI Basic Manual governs insurance coverage in the assigned risk plan.**

¶15        Redstang argues it did not breach its contract with Travelers because the NCCI Basic Manual does not control the policy. Not so.

¶16        Arizona established the assigned risk plan by statute as the coverage of last resort for employers who cannot otherwise obtain workers' compensation insurance. *See* A.R.S. § 23-1091.A. As the designated plan administrator, NCCI must "develop a plan of operation" for the assigned

risk plan, including "[a] method for apportioning the workers' compensation assigned risks among all insurers." *See* A.R.S. § 23-1091.D. Travelers, in turn, must participate in the assigned risk plan because it provides workers' compensation insurance in Arizona. *See* A.R.S. § 23-1091.G, .I. And Arizona expressly prohibits any deviation from NCCI rating rules by providers in the assigned risk plan. *See* A.R.S. § 23-1091.F.

**¶17** To ensure statutory compliance, NCCI must "monitor" participating insurance carriers and "measure [their] performance against [NCCI's] established standards." *See* A.R.S. § 23-1091.D.1. As a result, any policy Travelers issues under the assigned risk plan—including its policy with Redstang—must comply with the established standards and rating classifications outlined in NCCI's Basic Manual. *See id.*

**¶18** Contrary to its arguments here, Redstang was on notice of these requirements. Redstang knew it was completing an application through NCCI—not Travelers—for insurance coverage through the assigned risk plan. The application identified NCCI and its policies more than two dozen times. And, by signing NCCI's application forms, Redstang agreed to the use of "applicable experience rating rules, *as determined by NCCI.*" (Emphasis added.) NCCI assigned the application to Travelers, who issued Redstang's policy in compliance with Arizona law.

**¶19** In short, state law, the application, and the final policy provided notice that NCCI's rules and procedures governed Redstang's insurance coverage.

### B. Travelers correctly applied NCCI Rule 2G to Redstang's deficient payroll records.

**¶20** Redstang argues its payroll records provided sufficiently detailed information for Travelers to differentiate between class codes. Redstang further argues its policy with Travelers "does not say anything about what form the records need to be in."

**¶21** To begin, the issue here is not about the *type* of records Redstang kept. Indeed, the record plainly shows Redstang maintained "payroll and disbursement records" as required by the policy. Rather, the issue we must decide is whether Redstang's payroll records comply with the policy's requirement to contain "information needed to compute premium." They do not.

**¶22** When Redstang applied for coverage in the assigned risk plan, it multiplied the rate for each NCCI code by the percentage of payroll

spent on the task to estimate the annual policy premium. Redstang itself chose the rate codes and performed the calculations. The policy explicitly notified Redstang "The final premium will be determined after this policy ends by using the actual, not the estimated, premium basis and the proper classifications and rates that lawfully apply to the business and work covered by this policy."

**¶23**      Accordingly, Redstang was on notice that: (1) its initial premium was merely an estimate; and (2) its final premium would be determined by applying the same calculations to the actual time each of its employees spent within each NCCI rate code. Redstang, therefore, knew or should have known its payroll records needed to contain enough information for Travelers's auditor to identify the specific tasks employees performed and appropriately segregate the time.

**¶24**      NCCI Rule 2G, codifies this requirement in simple terms, obligating Redstang to "maintain proper payroll records, *which show the actual payroll by classification for that individual employee*." (Emphasis added.) Contrary to Redstang's argument on appeal, the plain language of Rule 2G defines "proper payroll records":

> Records must reflect actual time spent working within each job classification and an average hourly wage comparable to the wage rates for such employees within the employer's industry.
>
> Estimated or percentage allocation of payroll is not permitted.
>
> Note: If payroll records do not show the actual payroll applicable to each classification, the entire payroll of the individual employee must be assigned to the highest rated classification that represents any part of his or her work.

**¶25**      Redstang's timesheets, as contained in the record, do not meet this standard. Indeed, some simply refer to a job location, while others provide only generic descriptions such as "sheet metal" or "welding" and nothing more. Though some records provide more detailed information, they include only a single entry for the entire day showing the total hours worked across multiple tasks. Such records fall short of "reflect[ing] actual time spent working within each job classification" as required by Rule 2G.

**¶26**      In apparent recognition of this fact, Redstang's now argues "the records are adequate, *with some clarifying information from Mr. Bollschweiler*." (Emphasis added.) But Travelers asked for more information

and supporting documentation when Redstang disputed the audit. Redstang's two-page response, as shown in the record, merely reiterates the overly broad information listed on the time sheets and provides no supporting documentation. This response again falls far short of the requirements set forth in both the policy and NCCI Rule 2G.

¶27        Redstang next argues Rule 2G "does not allow Travelers to place all of [Redstang's] payroll into the highest rated class code." To the contrary, under the plain language of Rule 2G, when—as here—a company's payroll records "do not show the actual payroll applicable to each classification, the entire payroll of the individual employee must be assigned to the highest rated classification that represents any part of his or her work."

¶28        Based on the information Redstang provided to Travelers, the highest rated code for most of Redstang's employees is 5059—a code Redstang itself provided on the application. During the dispute process, Travelers adjusted one employee's classification based on documents Redstang provided and Redstang's insistence the employee only did fence work. But when Redstang failed to provide sufficient information to segregate the "payroll applicable to each classification" for the other employees, Travelers assigned the entire payroll "to the highest rated classification" as required by Rule 2G.

¶29        Finally, Redstang waived its argument that code 5059 does not apply to its employees. Though not first raised on appeal, Redstang did not challenge the accuracy of code 5059 until its response to Travelers's motion for summary judgment. Redstang had multiple opportunities to raise the issue earlier, including during the application process, the policy term, the post-termination audit, its first responsive pleadings, and the discovery process. *Cf. Westin Tucson Hotel Co. v. Ariz. Dep't of Revenue*, 188 Ariz. 360, 364 (App. 1997) (arguments not adequately raised in superior court are waived on appeal). Contrary to Redstang's arguments here, Mr. Bollschweiler did not "object[] to the use of the 5059 code." Rather, the record shows he objected to Travelers's "refus[al] to change the coding *back to the original codes*." (Emphasis added.) The original codes Redstang itself listed on the application were 5535, 5059, and 6400. Redstang cannot create an issue of fact to escape summary judgment by belatedly making an argument it should have raised during the discovery process when the parties could have developed an appropriate record. *See id.* In the absence of a record to support Redstang's argument, the argument fails.

### C.    Travelers proved its damages.

**¶30**        Redstang does not dispute: (1) it entered into an insurance policy contract with Travelers; (2) it authorized Imperial to cancel the policy if Redstang did not pay the premium; (3) Imperial asked Travelers to cancel the policy because of Redstang's nonpayment; and (4) Travelers cancelled the policy in accordance with Imperial's directions. Redstang also does not dispute Travelers made demand on Redstang to pay $40,604.00 due on the policy, an amount Redstang has not paid. The issue is therefore whether Travelers followed the policy terms when calculating the final premium and properly accounted for all payments received. Travelers did.

**¶31**        The policy explains, the "premium shown on the Information Page, schedules, and endorsements is an estimate. The final premium will be determined after this policy ends by using the actual, not the estimated, premium basis and the proper classifications and rates that lawfully apply to the business and work covered by this policy."

**¶32**        Redstang was therefore on notice the initial premium was merely an estimate. Redstang also was aware Travelers would calculate the final premium after determining the actual risk exposure based on an audit of Redstang's workplace and its payroll-related records. As discussed above, Travelers followed NCCI procedures and rules when reviewing Redstang's records and calculating the final premium.

**¶33**        Redstang next uses form over substance to argue Travelers cancelled its policy and improperly added an 11% short-term rate. Regarding cancellations and the short-term rate, the policy states:

> 1. If we cancel, final premium will be calculated pro rata based on the time this policy was in force. Final premium will not be less than the pro rata share of the minimum premium.

> 2. If you cancel, final premium will be more than pro rata; it will be based on the time this policy was in force, and increased by our short-term rate cancel[l]ation table and procedure. Final premium will not be less than the minimum premium.

**¶34**        Yes, as the insurer, Travelers must perform the actual cancellation. But Redstang's argument misses the point. Under the above policy terms, the proper question is how the policy came to be cancelled—who initiated the decision. On that point, the undisputed evidence shows Imperial, acting on Redstang's behalf, asked Travelers to cancel Redstang's

policy before the full term. Travelers complied with Imperial's request, and Redstang did not object to the cancellation. Because Redstang's agent started the early termination, Travelers—consistent with the policy's terms—increased Redstang's final premium by the "short-term rate cancel[l]ation table and procedure."

¶35            Finally, Redstang argues Travelers disregarded "additional payments" Redstang made beyond the estimated premium. Here again, the record does not support Redstang's argument. In a letter addressed to Travelers's counsel, Mr. Bollschweiler lists two payments Redstang made on its policy totaling $6,849.00. Two years later, when asked during his deposition how much Redstang paid Travelers, Mr. Bollschweiler confirmed $6,849.00 "sounds right." The record shows Travelers accounted both Redstang payments when calculating the final balance. And Redstang has identified no place in the record showing additional payments.

¶36            In short, Travelers established the premium due based on the audit was $47,453.00, which included the short-term cancellation fee of $4,650.00. After accounting for the $6,849.00 Redstang paid toward the estimated premium, the balance remaining was $40,604.00—the amount of the superior court's award.

## II.     The superior court correctly granted summary judgment on Redstang's counterclaims.

¶37            Redstang brought two counterclaims against Travelers: (1) consumer fraud; and (2) unfair or deceptive acts or practices in the business of insurance. On appeal, Redstang does not contest the superior court's grant of summary judgment on its consumer fraud claim. It, therefore, has waived any challenge to this ruling. *See Van Loan v. Van Loan*, 116 Ariz. 272, 274 (1977) ("The failure to raise an issue . . . in briefs on appeal constitutes a waiver of the issue.").

¶38            As for its unfair or deceptive practices claim, Redstang argues Travelers (1) misrepresented the type of records Redstang needed to keep, and (2) unfairly discriminated between insureds "having substantially like insuring, risk and exposure factors, or expense elements." *See* A.R.S. § 20-448.C. To begin, as discussed above, Travelers did not raise Redstang's premium based on the "type of records" Redstang kept. Rather, the lack of detailed information within the records triggered Travelers's obligation to use "the highest rated classification" when calculating Redstang's final premium. Put simply, this practice is neither unfair nor deceptive.

¶39 Turning to Redstang's second argument, the record contains no evidence Travelers treated other, similarly situated companies more favorably. And Redstang's assertions that it has since acquired workers' compensation insurance at much lower premiums from a different provider does not create an issue of material fact about Travelers's business practices. *See Aranki v. RKP Invs., Inc.*, 194 Ariz. 206, 209, ¶ 12 (App. 1999) (movant may succeed on summary judgment by showing "an absence of evidence for an essential element of the complaint").

## ATTORNEY FEES ON APPEAL

¶40 Both Redstang and Travelers request an award of attorney fees under A.R.S. § 12-341.01. We exercise our discretion and award Travelers, as the successful party on appeal, its reasonable attorney fees and costs upon compliance with ARCAP 21.

## CONCLUSION

¶41 We affirm the superior court's judgment.



AMY M. WOOD • Clerk of the Court
FILED: AA

11